ATTORNEYS FOR APPELLANT
Steve Carter
Attorney General of Indiana

Andrew A. Kobe
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Susan K. Carpenter
Public Defender of Indiana

Steven H. Schutte
Joanna Green
Deputy Public Defenders
Indianapolis, Indiana

In the
# Indiana Supreme Court

No. 82S00-0503-PD-78

STATE OF INDIANA,

*Appellant / Cross-Appellee*
*(Respondent below),*

v.

PAUL M. MCMANUS,

*Appellee / Cross-Appellant*
*(Petitioner below).*

Appeal from the Vanderburgh Circuit Court, No. 82C01-0102-CF-192
The Honorable William J. Brune, Special Judge

**June 27, 2007**

**Shepard, Chief Justice.**

Having completed his direct appeal, Paul McManus sought post-conviction relief. The post-conviction court largely rejected his claims, except for his contention that he is mentally retarded. Persuaded by his retardation claim, the post-conviction court vacated the sentence of death and entered a sentence of life without parole. We direct judgment for the State.

## Facts and Procedural History

In May 2002, a jury found Paul McManus guilty of murdering his wife and two daughters and recommended the death sentence. The trial court found that aggravating circumstances outweighed mitigators and sentenced McManus to death. McManus appealed, challenging among other things his competency to stand trial. We affirmed. McManus v. State, 814 N.E.2d 253 (Ind. 2004), cert. denied, 126 S.Ct. 53 (2005).

McManus petitioned for post-conviction relief on August 22, 2005 and amended the petition on January 6, 2006. The State moved for summary judgment as to most of McManus' claims, which the court granted. McManus then sought and received a change of judge. On March 6, 2006, the first day of evidentiary hearings, Senior Judge Brune reversed the partial grant of summary judgment to the State.

McManus filed his witness and exhibit list on January 6, 2006, in accord with the case management schedule. Four days after the close of discovery, on February 10, McManus filed an amended witness and exhibit list adding Dr. Edmund Haskins. The State then requested reports from Dr. Haskins and Dr. Dennis Olvera, but McManus did not supply the reports until February 27. The State sought to exclude the testimonies and reports of Dr. Haskins and Dr. Olvera citing these delays, but the court denied the motion.

During the evidentiary hearings, several witnesses testified about McManus' psychological history and mental abilities. At the age of seven, McManus took his first IQ test, but the examiner did not record a score. The examiner did conclude, however, that McManus fell "within the lower limits of the low average range." (PC Hr'g Tr. at 595.) McManus received a full-scale IQ score of 81 at age 11, and the examiner characterized his score as "within a low average range." (Id. at 596.) Three years later, McManus scored a 72, but "it was the examiner's judgment that [McManus] wasn't giving adequate effort . . . [and that] the scores likely underestimated his potential intellectual ability." (Id. at 597.) McManus took his next IQ test after the murders (at age 30) and scored a 70, but the examiner thought the score was "suppressed slightly because of [McManus] being anxious and depressed at the time of testing."

(Id. at 597-98; Trial Tr. at 1421.)  McManus took his most recent IQ test in February 2006 (at age 34) and scored a 78.  (PC Hr'g Tr. at 598.)

Dr. Olvera and his assistant performed two adaptive behavior assessments on McManus based on interviews with McManus' three employers, his mother, his sister, and his sister-in-law. (Petr.'s Ex. 11 at 1.)  The Adaptive Behavior Assessment System II ("ABAS II") has three primary domains (Conceptual, Social, and Practical), and McManus did not fall within the mentally retarded range on any of these domains.  (Id. at 4.)  The ABAS II also has ten subdomains, and Dr. Olvera testified that McManus scored in the mental retardation range in "Functional Academics" and just outside the mental retardation range in "Community Use." (Id.)[1]  Of the three domains tested by the Vineland-II Adaptive Behavior Scales ("VABS II") (Communication, Daily Living, and Socialization), McManus scored in the mental retardation range in "Communication" and both within and without the mental retardation range in "Socialization."  (Id. at 2-3.)[2]  These scores led Dr. Olvera to conclude that McManus had substantial impairments of adaptive behavior.  (Id. at 5.)

Co-workers testified that McManus performed ably at his three jobs, often working 18-20 hours per day.  (Trial Tr. at 615-16, 843-44, 956-57, 1019-20, 1037.)  He successfully completed forklift training, including a written test, and operated a forklift thereafter.  (PC Hr'g Tr. at 238-39, 241.)  Although McManus has always had learning disabilities, poor reading skills, and ADHD, necessitating special education during his school years, he did graduate high school. (Trial Tr. at 1213-14, 1363-64, 1679-81; PC Hr'g Tr. at 219, 271-72.)

Persuaded that McManus had a freestanding Atkins claim and that the preponderance of the evidence established that McManus was mentally retarded, Judge Brune granted McManus' petition in part, vacating the death sentence, and imposed a sentence of life without parole.

---

[1] McManus received a score of 2 in "Functional Academics" and 5 in "Community Use."  Scores on the ABAS II have a mean of 10 and a standard deviation of 3.  (Petr.'s Ex. 11 at 3-4.)  A person is considered in the mental retardation range if they score lower than a 4.  (See PC Hr'g Tr. at 602-03.)

[2] McManus received scores of 21 and 21 in "Communication" from the two respondents on the VABS II.  He received scores of 71 and 54 in "Socialization."  VABS II scores have a mean of 100 and a standard deviation of 15. (Petr.'s Ex. 11 at 2-3.)  Thus, a person is considered in the mental retardation range if they score lower than a 70. (See PC Hr'g Tr. at 604-05.)

(App. at 522-605, 609-10.)  The State appealed and McManus cross-appealed, presenting a total of five claims for our resolution.

## I.  Mental Retardation

Indiana statutes have provided a pre-trial means by which mentally retarded defendants can seek exemption from the death penalty since 1994, yet McManus waited until his post-conviction proceedings in 2005 to raise a mental retardation claim.  The post-conviction court considered McManus' mental retardation claim on the merits relying on the U.S. Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304 (2002).  We must determine first whether McManus' claim of retardation was preserved even though he failed to follow Indiana's existing statutory procedure, and if so, whether McManus meets the definition of mental retardation.

### A.  Preservation of the Claim

In 1994, before any constitutional mandate, Indiana declared that a request for the death penalty must be dismissed when a defendant establishes to the court's satisfaction that he is mentally retarded.  See 1994 Ind. Acts 1851-52 (currently codified at Ind. Code Ann. ch. 35-36-9 (West 2006)).  The act established pre-trial procedures requiring a defendant to file a petition alleging that he is mentally retarded at least twenty days prior to the omnibus date.  Ind. Code Ann. § 35-36-9-3.  The court must then order an evaluation and determine at least ten days prior to trial whether the defendant is in fact mentally retarded.  Id. §§ 35-36-9-3, -5.  If a defendant is found mentally retarded, then the State may not pursue the death penalty.  Id. §§ 35-36-9-6, -7. If these procedures are not followed, however, a defendant waives his right to make this claim on appeal.  See Smallwood v. State, 773 N.E.2d 259 (Ind. 2002) (defendant failed to employ mental retardation statutory procedure and waived claim for appeal).

Until the Supreme Court's decision in Atkins, there was no constitutional prohibition against executing mentally retarded defendants.  As such, Indiana defendants who claimed to be

mentally retarded sought refuge only under Indiana's statutory framework. In Atkins, however, the Supreme Court relied on states like Indiana in declaring that there was a "legislative consensus that the mentally retarded should be categorically excluded from execution." 536 U.S. at 315-16, 318. A majority of the Court thus concluded that executing a mentally retarded offender is cruel and unusual punishment under the Eighth Amendment.[3] Id. at 321. The Court did not define mental retardation[4] or specify procedures to comply with this new constitutional mandate, but instead, left these difficult tasks to the states. Id. at 317.

After Atkins, states like Indiana, which already had statutory procedures to prevent the execution of mentally retarded defendants, were forced to decide how Atkins should apply to existing law. Who can raise an Atkins claim? If a defendant failed to use the state's existing procedures, could the defendant later raise an Atkins claim after the state remedy was effectively waived? Did Atkins create a right independent of the existing state remedy? In other words, did Atkins require a change to the existing state procedures to comply with the new constitutional mandate?

Faced with these questions, the Supreme Court of Kentucky held Kentucky's statutory scheme was consistent with Atkins and declared it constitutional. Bowling v. Commonwealth, 163 S.W.3d 361, 371-73 (Ky. 2005) ("Atkins merely reaffirmed this State's preexisting prohibition against executing the mentally retarded."). Because Atkins did not broaden the statutory protection already afforded to Kentucky defendants, the court held that a defendant who

---

[3] The Court said:

> Our independent evaluation of the issue reveals no reason to disagree with the judgment of 'the legislatures that have recently addressed the matter' and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender.

Atkins, 536 U.S. at 321 (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986)).

[4] The Court noted that statutes defining mental retardation generally conform to the clinical definitions provided by the American Association on Mental Retardation and American Psychiatric Association and concluded the definitions withstand constitutional challenge so long as they include those "mentally retarded offenders about whom there is a national consensus" prohibiting their execution. Id. at 317 n.22.

failed to follow Kentucky's pre-<u>Atkins</u> procedures waived review of his mental retardation claim, even post-<u>Atkins</u>.  <u>Id.</u>

We considered these questions in <u>Pruitt v. State</u>, 834 N.E.2d 90 (Ind. 2005).  Unlike Kentucky, we concluded our statutory scheme did not fully withstand constitutional challenge.  As originally enacted, Ind. Code § 35-36-9-4 required a defendant to "prove by clear and convincing evidence that the defendant is a mentally retarded individual."  <u>See</u> 1994 Ind. Acts 1851-52 (codified at Ind. Code Ann. § 35-36-9-4 (West 2004)).  We determined however, that the "clear and convincing" requirement was unconstitutional in light of <u>Atkins</u>.[5]  <u>Pruitt</u>, 834 N.E.2d at 102-03.  In effect, we concluded that <u>Atkins</u> necessitated lowering the burden of proof found in Indiana's existing statutory exemption.

McManus clearly waived review under our statutory scheme as originally written.  However, McManus' post-<u>Atkins</u> claim did not ripen until 2005 when we modified our statutory scheme in <u>Pruitt</u> to comply with <u>Atkins</u>.  As such, the claim of mental retardation was properly before the post-conviction court.

### B.  McManus Does Not Meet the Standard for Retardation

The post-conviction court found by a preponderance of the evidence that McManus met Indiana's definition of a "mentally retarded individual."  (App. at 605.)  Indiana Code § 35-36-9-2 defines "mentally retarded individual" as one who manifests (1) significantly subaverage intellectual functioning, and (2) substantial impairment of adaptive behavior before the age of twenty-two.  To satisfy this definition, a defendant must prove both.  <u>Pruitt</u>, 834 N.E.2d at 103.  The court's findings that McManus satisfied both the "intellectual functioning" and "adaptive behavior" prongs are factual determinations that are subject to review under a "clearly erroneous" standard.  <u>Id.</u> at 104.

---

[5] We feared the heightened standard of proof would result in the execution of some persons who are mentally retarded.  <u>Pruitt</u>, 834 N.E.2d at 103.

## (1)  Intellectual Functioning

In determining what qualifies as "significantly subaverage intellectual functioning" we have made reference to the works of the American Association on Mental Retardation and the American Psychiatric Association.  Woods v. State, 863 N.E.2d 301, 304 (Ind. 2007) (citing Atkins, 536 U.S. at 308 n.3).  "Under these descriptions, a person is considered to meet the subaverage intellectual functioning component if the person's full-scale IQ test score is two standard deviations below the mean; i.e., an IQ between 70 and 75 or lower."  Id.; see also Williams v. State, 793 N.E.2d 1019, 1028 (Ind. 2003) (quoting Atkins, 536 U.S. at 309 n. 5) ("'An IQ between 70 and 75 or lower, . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'").

IQ tests alone are not necessarily conclusive, and courts may "consider IQ scores together with other evidence of mental capacity."  Pruitt, 834 N.E.2d at 106.  Despite the court's ability to consider other factors such as work history, school history, and life functioning, we have held that "IQ scores may be such that they show the person does *not* meet the intellectual component of mental retardation."  Woods, 863 N.E.2d at 304; Williams, 793 N.E.2d at 1028 (Williams' full-scale IQ scores of 78 and 81 not within cutoff range for mental retardation).

Courts should also consider whether a defendant is putting forth his full effort during IQ testing.  For example, in Pruitt, the trial court discounted a full-scale IQ score of 52 after the examiner "testified that he did not believe that Pruitt was working up to his potential . . . and [that] the test was therefore not an accurate measure of [Pruitt's] intellectual functioning."  834 N.E.2d at 105.  Since some of Pruitt's scores suggested significantly subaverage intellectual functioning and others did not, the trial court also considered Pruitt's school and work history. The court found that Pruitt was able to fill out employment applications and to support himself through "a number of jobs over the years including construction, fast food, and long distance truck driver."  Id. at 106.  These findings led the trial court to conclude Pruitt failed to satisfy the intellectual functioning prong, and we affirmed.

7

Although the post-conviction court in this case concluded McManus was significantly subaverage as to intellectual functioning, this finding is not supported by the record and is clearly erroneous. McManus' IQ has been tested five times throughout his life (at ages 7, 11, 14, 30, and 34). (PC Hr'g Tr. at 595-98.) Of these five tests, McManus scored *above* the 70-75 cutoff on three. On the two remaining tests, McManus scored 70 and 72, but the record demonstrates these scores were suppressed because McManus was either not working to his full potential or suffering from severe depression and anxiety. (Id.; Trial Tr. at 1688-92; Petr.'s Ex. 11.) The following chart summarizes the results.

| Approximate Age | Full-Scale IQ | Verbal IQ | Performance IQ |
|---|---|---|---|
| 7 years old | Lower limits of low average range (no scores reported) | | |
| 11 years old | 81 | 77 | 88 |
| 14 years old | 72 | 68 | 81 |
| 30 years old | 70 | 71 | 74 |
| 34 years old | 78 | 75 | 85 |

Experts for the trial court, the State, and the defense testified both at trial and during the post-conviction hearing that McManus is *not* below the level of intellectual functioning that defines mental retardation. Dr. David Hilton, a court-appointed psychiatrist, testified that his "abbreviated assessment of cognitive functioning would suggest probably low average intelligence," and he noted that McManus' "general presentation, communication skills, and use of vocabulary . . . would *not* suggest mental retardation, nor would his history of being able to maintain employment in a number of different jobs with varied skill requirements." (State's Trial Ex. 63 at 12 (emphasis added).)

John Ireland, Ph.D., a clinical psychologist who testified at trial for the defense, concluded McManus' actual IQ was likely in the "80-type range," well above the 70-75 cutoff. (Trial Tr. at 1692.) Dr. Ireland gave less weight to McManus' age fourteen IQ score of 72, because the evaluator noted McManus "was active, fidgety, immature, impulsive, easily frustrated, wanted to terminate testing activities, [and] responded with I don't know." (Id. at 1689.) Dr. Ireland questioned whether this score indicated borderline intellectual functioning or

8

was the simple result of McManus not trying.  (Id.)  In addition, since these are typical behaviors for students with ADHD, Dr. Ireland questioned whether McManus' ADHD or other learning disabilities influenced the score.  (Id. at 1691-92.)

Michael Gelbort, Ph.D., a clinical psychologist who testified at trial for the defense, conducted McManus' IQ test at age 30, which resulted in a score of 70.  (Id. at 1417-18.)  Even though this is McManus' lowest score, this score still falls right on the cutoff, and Dr. Gelbort conceded that this score was likely suppressed since McManus was on trial for murder and obviously experiencing anxiety and depression.  (Id. at 1421.)

Edmund Haskins, Ph.D., a clinical neuropsychologist who testified for the defense at the post-conviction hearing, concluded McManus' IQ was likely "in the high 70s, maybe even low 80s," again above the 70-75 cutoff.  (PC Hr'g Tr. at 429.)  Dr. Haskins himself conducted McManus' IQ test at age thirty-four, which resulted in a score of 78.  (Id. at 403.)  After reviewing McManus' history and other scores, Dr. Haskins speculated that McManus' learning disability and ADHD likely contributed to executive functioning problems and McManus' two suppressed scores.  (Id. at 403-04, 413-16.)

Dennis Olvera, Ph.D., a psychologist who testified for McManus at the post-conviction hearing, concluded that McManus was *not* currently mentally retarded.  (Id. at 383.)  Dr. Olvera testified, "I can't [say McManus is currently mentally retarded] because of the IQ testing that Dr. Haskins completed and the elevation of the scores."  (Id.)

Finally, Martin Groff, Ph.D., a psychologist who testified at the post-conviction hearing for the State, reviewed all of McManus' IQ tests and concluded McManus is *not* below the level of intellectual functioning that defines mental retardation.  (Id. at 602.)  Dr. Groff testified that only two scores raised the potential issue whether McManus might satisfy the intellectual functioning prong, and both scores were still within the 70-75 cutoff (one score of 70 and the other 72).  (Id. at 595-98, 600-01.)  More importantly, Dr. Groff discounted the score of 72 because "it was the examiner's judgment that Mr. McManus wasn't giving adequate effort," and

9

as a result, "the scores likely underestimated his potential intellectual ability."[6] (Id. at 597.) He also discounted the score of 70 because the examiner noted that McManus was "anxious and depressed" at the time of testing which would suppress his score. (Id. at 598.)

A careful review of McManus' testing history alone demonstrates McManus is *not* significantly subaverage as to intellectual functioning. McManus' school history, work history, and life functioning only strengthen this conclusion. Despite McManus' struggle with ADHD and learning disabilities, he did graduate high school. (Trial Tr. at 1174.) McManus also worked three jobs and took great pride in supporting his family. (Id. at 615-16.) He worked at a local restaurant & bar called Breakers, where he managed other bar backs and occasionally worked security. (Id. at 840-41.) His supervisor at Breakers described him as an "excellent employee." (Id. at 841.) McManus also worked at RuVan Plastics, currently known as Adco. (PC Hr'g Tr. at 231.) At RuVan, McManus worked in several departments, including cut-up, mixing, and trash. (Id. at 232.) He drove a forklift at RuVan, which required him to pass a test. (Id. at 238-39.) Once again, a supervisor described him as a "very good worker" who was reliable. (Id. at 240-41.) Finally, between his other shifts, McManus cleaned the office at Dayton Freight. (Trial Tr. at 1253.)

Perhaps most indicative of his functioning and mental capacity, McManus was known by all as an excellent father who ably cared for his two daughters, including Shelby who suffered from severe disabilities. (Id. at 1244, 1249, 1251-53.) McManus comfortably cared for Shelby and was able to feed her through a tube in her stomach,[7] work with her therapists, bathe her, play with her, and make her laugh. (Id. at 1251-53.)

The post-conviction court's finding that McManus possesses significantly subaverage intellectual functioning was clearly erroneous. While this holding by itself disposes of McManus' retardation claim, we briefly consider McManus' presentation about adaptive behavior.

---

[6] The examiner also "noted that Mr. McManus tried to terminate the testing and would respond that he didn't know answers to questions, but with prompting [he] was sometimes able to produce those answers." (PC Hr'g Tr. at 597.)
[7] McManus' mother testified that she was always afraid to feed Shelby through her stomach, and she was impressed by McManus' ability and comfort caring for his children, especially Shelby. (Trial Tr. at 1252, 1271.)

<u>(2) Adaptive Behavior</u>

The second prong requires defendants to prove "substantial impairment of adaptive behavior." Indiana's adaptive behavior prong most closely resembles the AAMR definition, which requires "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." Am. Ass'n on Mental Retardation, <u>Mental Retardation: Definition, Classification, and Systems of Supports</u> 8 (10th ed. 2002); <u>see also</u>, <u>Pruitt</u>, 834 N.E.2d at 108. Although similar, the definition provided by the American Psychiatric Association requires, "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 39 (4th ed. 1994) (DSM-IV).

Relying primarily on the testimony Dr. Olvera gave for the defense, the post-conviction court found McManus proved by a preponderance of the evidence substantial impairment of adaptive behavior. (App. at 603-05.) Our review of the record leads us to disagree.

Dr. Olvera conducted one adaptive behavior assessment himself, and his employee Julie Williams, M.A., conducted a second assessment. (Petr.'s Ex. 11 at 1.) Dr. Olvera administered the ABAS II on January 6, 2006, and Ms. Williams administered the VABS II on February 19, 2006. (<u>Id.</u>) These tests have similar formats, but the ABAS II most closely resembles the AAMR definition by scoring the same three domains: Conceptual, Social, and Practical.[8] (<u>Id.</u> at 3; PC Hr'g Tr. at 358-59.) We give greater weight to the ABAS II scores since Indiana's definition also tracks the AAMR definition. <u>Pruitt</u>, 834 N.E.2d at 108.

---

[8] The ABAS II still scores ten sub-domains, but the test grouped these sub-domains into three broad categories: Conceptual, Social, and Practical to trace the revised AAMR definition. Each domain includes the following subdomains:

Conceptual: Communication, Functional Academics, and Self-Direction
Social: Leisure and Social
Practical: Community Use, Home/School Living, Self-Care, Health and Safety, and Work

Patti L. Harrison & Thomas Oakland, <u>A Technical Report: ABAS II</u>, http://harcourtassessment.com/hai/Images/pdf/technical_reports/ABAS_II_Tech_Rpt_Web.pdf (last visited June 19, 2007).

To complete the ABAS II, Dr. Olvera interviewed four respondents: three of McManus' former employers and McManus' mother.[9] (Petr.'s Ex. 11 at 1.) Based on these interviews, Dr. Olvera calculated four primary scores: one for each domain (Conceptual, Social, and Practical), and a General Adaptive Composite (GAC) score. Each of these scores has a mean of 100 and a standard deviation of 15. (Id. at 3-4.) *None* of McManus' scores fell more than one standard deviation below the mean:

| Conceptual | 82 |
|---|---|
| Social | 90 |
| Practical | 93 |
| GAC | 88 |

In Dr. Olvera's words, "None of the scaled scores for the ABAS II adaptive domains or the GAC was consistent with what would be expected among individuals who have mental retardation."[10] (Id. at 4.) A defendant must show substantial impairment in at least one of the three primary domains (Conceptual, Social, or Practical). Since McManus did not show impairment in any of the three, as acknowledged by Dr. Olvera, he failed to satisfy the adaptive behavior prong.

---

[9] Dr. Olvera testified, "When I talked to the three employers, all of them thought that Mr. McManus was not impaired." (PC Hr'g Tr. at 345.)

[10] Dr. Olvera attempts to argue that McManus still shows significant impairment of adaptive functioning on the ABAS II when the ten individual scores are considered. The individual scaled scores have a mean of 10 and a standard deviation of 3, and McManus' scores were:

| | |
|---|---|
| Communication | 8 |
| Community Use | 5 |
| Functional Academics | 2 |
| Home Living | 10 |
| Health and Safety | 9 |
| Leisure | 8 |
| Self-Care | 12 |
| Self-Direction | 10 |
| Social | 8 |
| Work | 11 |

(Petr.'s Ex. 11 at 3-4.) We note, however, that the only two outliers are Community Use and Functional Academics, and only Functional Academics is two standard deviations below the mean. McManus' documented learning disabilities and ADHD are likely the cause of these suppressed scores, not mental retardation.

Ms. Williams ran a second adaptive behavior assessment, the VABS II. These scores were based on her interviews with Ann Stone (McManus' sister) and Jaci McManus (McManus' sister-in-law). (Id. at 1.) The weight of the results is open to doubt, for as Dr. Olvera conceded, McManus' family members "might be inclined to portray Mr. McManus as less competent than he might actually be, in an effort to help him evade the death penalty." (Id. at 5.)

The VABS II is broken into three primary domains (Communication, Daily Living, and Socialization) and nine subdomains. (Id. at 2-3.) The domains and composite scores have an average of 100 and a standard deviation of 15; thus, one would expect mentally retarded individuals to score below 70. The subdomains have an average of 15 and a standard deviation of 3, meaning mentally retarded individuals score below 9. (Id.) McManus' scores were:

|  | Jaci McManus Scaled Score | Ann Stone Scaled Score |
|---|---|---|
| Receptive | 5 | 3 |
| Expressive | 8 | 6 |
| Written | 6 | 5 |
| **Communication** | **21** | **21** |
| Personal | 12 | 16 |
| Domestic | 10 | 12 |
| Community | 12 | 10 |
| **Daily Living** | **75** | **81** |
| Interpersonal/Relations | 11 | 10 |
| Play and Leisure | 11 | 8 |
| Coping | 11 | 9 |
| **Socialization** | **71** | **54** |
| **Composite** | **55** | **52** |

(Id. at 3.) The communication scores heavily weigh down McManus' composite scores. Dr. Olvera testified that the communication scores were lower than he would expect. In fact, he said the communication scores were what he "would expect of somebody functioning in the range of severe mental retardation, not somebody with mild mental retardation." (PC Hr'g Tr. at 362.) It

13

seems apparent that these scores, inconsistent with the rest of the record, were suppressed by the affection of the relatives who supplied the input.

An adequate adaptive behavior assessment necessarily considers McManus' work history and day-to-day life, both of which illustrate his abilities – not deficits. As we already said, McManus successfully held down three jobs. Each of his employers testified that he was a good, reliable worker. Three employers contributed to his ABAS II scores, and each employer testified that he was not impaired. As a result, the ABAS II scores did *not* reflect significant impairment in any of the three domains. Finally, McManus had no difficulty feeding Shelby through her feeding tubes or caring for her on a daily basis. We conclude that McManus does not have significant adaptive behavior impairments.

In sum, McManus does not satisfy the intellectual functioning or adaptive behavior prongs. As such, the rule of Atkins does not bar the death penalty.


## II. Testimonies of Dr. Haskins and Dr. Olvera

The State contends that the post-conviction court erred when it allowed Dr. Olvera and Dr. Haskins to testify despite McManus' apparent failure to list Dr. Haskins on the final witness list and to respond timely to the State's discovery requests.

Trial and post-conviction courts are given wide discretion in discovery matters and "in determining what constitutes substantial compliance with discovery orders, and we will affirm their determinations as to violations and sanctions absent clear error and resulting prejudice." Dye v. State, 717 N.E.2d 5, 10-11 (Ind. 1999).

While the State has not articulated specific prejudice as a result of McManus' tardiness in listing Dr. Haskins as a witness or in tendering the doctors' reports, it is difficult to make such a showing when an opponent does not tender important evidence until a week before trial. The

14

court afforded the State a chance for a continuance, but bringing a capital post-conviction case to a hearing at all is a challenging matter.

In any event, the testimonies of Dr. Haskins and Dr. Olvera were not particularly harmful to the State's case. While the post-conviction court might have ruled otherwise, this departure from the case management order and the subsequent admission of the doctors' testimonies do not seem like grounds for reversal.

### III. McManus' Competency at Trial

McManus argues that he was not competent to stand trial and that his incompetence prejudiced him before the jury. The post-conviction court held these claims barred by *res judicata* because of our treatment of them in McManus' direct appeal. See McManus, 814 N.E.2d at 260-64. Still, McManus asserts that we did not address competency despite our conclusion that "we cannot say that the trial court's competency determination was clearly erroneous." Id. at 264. The post-conviction court was correct that McManus' competency claims are *res judicata*.

### IV. Ineffective Assistance of Trial Counsel

McManus contends that his trial attorneys were ineffective for their failure to adequately advocate for his incompetency at trial and for their failure to properly investigate mitigating factors for the penalty phase.

To establish a claim for ineffective assistance of counsel, a defendant must satisfy two prongs: First, the defendant must demonstrate that counsel performed deficiently; second, the defendant must demonstrate that prejudice resulted. McCary v. State, 761 N.E.2d 389, 392 (Ind. 2002) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). These two prongs present

independent inquiries, either of which may be sufficient for disposing of a claim. <u>Williams v. State</u>, 706 N.E.2d 149 (Ind. 1999).

Deficient performance is "representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." <u>McCary</u>, 761 N.E.2d at 392. Consequently, our inquiry focuses on the attorneys' actions while remembering that "[i]solated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." <u>Timberlake v. State</u>, 753 N.E.2d 591, 603 (Ind. 2001). Indeed, a "strong presumption arises that counsel rendered adequate assistance." <u>Id.</u>

McManus first faults his trial counsel for failing to seek a competency hearing. The record proves this contention misinformed. Trial counsel moved for a mistrial based on McManus' competency on three separate occasions. (<u>See</u> Trial Tr. at 832-34, 989-90, 1062.) After arguments on the first motion, the court ruled that "the defendant is competent to assist in his own defense," and said, "I'm not convinced that the situation would improve any more over the next few weeks than it is right now." (<u>Id.</u> at 836.) The trial court also held an evidentiary hearing on the mistrial motion, at which the court again found McManus competent to stand trial and denied the motion. (Mistrial Hr'g Tr. at 69.) There seems little else that McManus' trial counsel could have done to advocate his incompetency. Clearly, this does not evince "representation that fell below an objective standard of reasonableness." <u>McCary</u>, 761 N.E.2d at 392.

McManus' other contention faults his trial counsel for failing to adequately present mitigating evidence in the penalty phase. Specifically, McManus argues that counsel did not investigate or secure experts, witnesses, and other evidence pertaining to his education, personal relationships, and impaired mental ability.

McManus' trial counsel presented the bulk of their mitigating evidence during the guilt phase of trial. The evidence included favorable testimony from three mental health professionals, a childhood friend, a co-worker, and McManus' mother and sister, all during the

two days leading up to the start of the penalty phase. (See Trial Tr. at 1076-1550.) The testimony covered McManus' educational history, childhood, personal relationships, and evidence of mental impairments. (See, e.g., id. at 1098-1109, 1120-24, 1154-57, 1161-77, 1210-15.)

Counsel reasonably concluded that in the penalty phase the jury would be able to remember mitigating evidence presented over the previous two days. And we recall that "[w]hen mitigating evidence has already been presented at the guilt phase of trial, counsel's failure to duplicate this evidence during the penalty phase of trial does not constitute deficient performance." Wrinkles v. State, 749 N.E.2d 1179, 1199 (Ind. 2001) (citing Wisehart v. State, 693 N.E.2d 23, 48 (Ind. 1998)).

Nonetheless, McManus argues that trial counsel should have investigated further and presented even more mitigating evidence. But McManus points only to evidence cumulative of that presented at trial. For example, McManus asserts that trial counsel did not investigate his complete educational history. (Appellee's Br. at 42.) He argues that two of his former teachers should have testified at trial about his low intellect, enrollment in special education classes, social problems, difficulty reading, attention problems, and problems in his personal life. The record shows, however, that this evidence was admitted at trial. (See Trial Tr. at 1104 (diagnosed with ADHD as a child), 1162 (parents divorced at age two or three), 1165-67 (after divorce, McManus rarely saw father, who later went to prison when McManus was seven; McManus had dyslexia, making reading difficult, and enrolled in special education classes), 1174-77 (parents remarried, but within two years father left for another woman, after which McManus attempted suicide), 1211-13 (other children made fun of McManus' speech problems and he "really never had friends" in school), 1367 (intellectual functioning test at age seven indicates McManus is "at the lower limits of the low average range").)

The investigation and presentation of mitigating evidence by trial counsel was substantial and the fact that post-conviction lawyers have managed to find some that may be non-cumulative does not lead to a conclusion different from that of the post-conviction court, that McManus' trial counsel performed better than the Sixth Amendment requires.

## V. Trial Counsel's Alleged Conflict of Interest

Lastly, McManus contends that trial counsel worked under a conflict of interest that inhibited McManus' ability to present his case. McManus points to his father's limited, and eventually non-existent, financial backing of trial counsel Mitch Rothman as creating a conflict between Rothman's own financial interest and his duties to McManus. This conflict allegedly prevented Rothman and co-counsel Glenn Grampp from pursuing a full mitigation investigation or a change of venue. Moreover, McManus argues that Rothman violated his duty of loyalty by allegedly disclosing to the trial court that he would not return if the motion for mistrial were granted.[11]

"To establish a violation of the Sixth Amendment due to a conflict, a defendant who failed to raise the objection at trial must demonstrate that trial counsel had an actual conflict of interest and that the conflict adversely affected counsel's performance." Woods v. State, 701 N.E.2d 1208, 1223 (Ind. 1998) (citing Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)).

McManus has not demonstrated that his trial counsel had an actual conflict. Lack of sufficient funds is a problem many defense attorneys face. McManus' trial counsel pursued his case without any evidence of sacrificing the quality of representation or expertise to cut costs. And while the source of funding can sometimes lead to a conflict, such as when a third-party payor's interests supercede those of the client, McManus has not shown that kind of conflict here.

Rothman's alleged disclosure to the trial court also lacks indicia of conflict. Rothman was communicating honestly and openly with the tribunal, something all courts expect from members of the bar, and something clients expect no less. McManus presents no evidence that Rothman's loyalty belonged to anyone other than McManus. McManus' allegations of conflict, which seem more like new labels for claims already discussed, are without merit.

---

[11] The disclosure is "alleged" because the record does not definitively show that Rothman revealed his intentions to the court. Rothman indicated in his post-conviction testimony that the question of his return "*may have been* a topic of discussion during a discussion in chambers." (PC Hr.'g Tr. at 135 (emphasis added).)

## Conclusion

We reverse the post-conviction court's holding on retardation, but otherwise affirm. Judgment for the State.

Dickson and Sullivan, JJ., concur.

Boehm, J., dissents with separate opinion, in which Rucker, J., concurs.

**Boehm, Justice, dissenting.**

I respectfully dissent. The majority has stated the applicable law correctly as I understand it. I believe, however, that the majority's review of the evidence does not give sufficient deference to the trial court's finding of mental retardation.

The trial court's finding is subject to a clearly erroneous standard of review. Pruitt v. State, 834 N.E.2d 90, 104 (Ind. 2005). The trial court was presented with conflicting evidence on McManus's intellectual functioning and his adaptive behavior. The majority notes evidence suggesting McManus is not deficient in intellectual functioning or adaptive behavior, but the record is replete with conflicts in expert and lay testimony on both issues. McManus's IQ tested at 70 at age 22 and 72 at age 14. Both scores are in the range of intellectual functioning qualifying for mental retardation. The explanation offered that low IQ scores can be attributable to stress or inattention is for the trial court to accept or reject. Similarly, expert testimony was offered to explain the conclusion of substantial impairment of adaptive behavior despite the relatively favorable accounts of McManus in the workplace. In addition, several witnesses testified to McManus's adaptive behavior at a young age and more recently. Their accounts of his abilities and difficulties varied, and the trial court could properly credit the defense witnesses.

We recently affirmed a finding by a trial court that a defendant was not mentally retarded despite significant evidence suggesting that he was. See Pruitt, 834 N.E.2d at 90. In my view the clearly erroneous standard of review dictates affirming this trial court's determination as to mental retardation as well.

Rucker, J., concurs.