Darren WITT, Appellant–Petitioner,

v.

STATE of Indiana, Appellee–
Respondent.

No. 45A05–1005–PC–319.

Court of Appeals of Indiana.

Nov. 19, 2010.

Transfer Denied Jan. 21, 2011.

See also 867 N.E.2d 1279.

Susan K. Carpenter, Public Defender of Indiana, Joanna Green, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Darren Witt appeals the denial of his petition for post-conviction relief, wherein he challenged his sentence of life without parole ("LWOP") imposed following his plea of guilty to Murder. We affirm.[1]

### Issues

Witt presents two issues for review:

I. Whether his sentence violates Indiana statutory authority because he is a mentally retarded individual who has been sentenced to life in

---

1. We held oral argument in this case on October 28, 2010, at Columbus North High School. We thank Columbus North High School staff for their hospitality and commend the attorneys for their able advocacy.

prison without the possibility of parole; and

II. Whether he received the effective assistance of counsel.

### Facts and Procedural History

In October of 1995, Witt was charged with murdering Jamie Haley by inflicting multiple stab wounds.[2] The State sought the death penalty based upon the aggravating circumstances of (1) the murder was an intentional killing in the course of a robbery and (2) Witt was on parole at the time. Witt initiated proceedings to determine whether he was mentally retarded and thus ineligible for the death penalty.

A hearing was conducted on November 1 and 4, 1996. Dr. Douglas Caruana, a clinical psychologist who had examined Witt pursuant to defense counsel's request, testified that he had administered an IQ test and Witt had scored 79. Dr. Caruana opined that Witt's adjusted score was "roughly in the 76 range." (App.463.) He indicated that the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders ("DSM") defined "significantly subaverage intellectual functioning" at about 70 or below. (App. 464.)

Dr. George Batacan, a psychiatrist who had been appointed by the trial court, evaluated Witt and reviewed documentation relative to Witt's mental and functional capabilities.[3] Dr. Batacan testified that, in his opinion, Witt was not mentally retarded and was "fully oriented." (Tr. 381.)

Dr. Michael Ingersoll, a clinical psychologist appointed by the trial court, administered an IQ test to Witt and also administered a test designed to measure Witt's adaptive behavior functioning. He estimated an accurate IQ score to be around 79.[4] Dr. Ingersoll opined that Witt had experienced problems with impulse control, but did not meet diagnostic criteria for mental retardation. Two of Witt's former co-workers also testified regarding his ability to perform tasks and his social functioning.

Following the hearing, the trial court issued an order reflecting its determination that Witt was not mentally retarded. In November 1996, Witt and the State entered into an "open plea" agreement. *See Witt v. State,* 867 N.E.2d 1279, 1280 (Ind.2007). The State amended the charging information by adding a charge of Robbery as a Class A felony, Indiana Code Section 35–42–5–1, and substituting a request for a sentence of LWOP for its earlier death penalty request. Witt agreed to plead guilty to Murder and Robbery; in exchange, the State agreed to recommend that Witt receive a LWOP sentence. "Witt said he would agree that a sentence of life without parole was appropriate." *Witt,* 867 N.E.2d at 1280. On December 6, 1996, after accepting Witt's guilty plea, the trial court sentenced him to LWOP.

During the next nine and one-half years, Witt did not seek direct or collateral review of his convictions or sentence. *See id.* On May 5, 2006, he filed a petition for

---

2. He was also charged with Felony Murder, Ind.Code § 35–42–1–1, and Criminal Deviate Conduct, Ind.Code § 35–42–4–2.

3. These included affidavits, fifteen witness interviews, a psychological report compiled at age 15, report on Wechsler Intelligence, Special Education Psychological Report of 1988, a psychological evaluation, DOC Reception data, a Highland school record, an Indiana

Special Education Conference report, and psychological testing and reports from Dr. Caruana.

4. The IQ test administered by Dr. Ingersoll actually resulted in an IQ score of 86, which Dr. Ingersoll thought was invalid, due to IQ testing only one week earlier.

permission to file a belated notice of appeal pursuant to Indiana Post–Conviction Rule 2, and the trial court granted the petition without a hearing. On direct appeal in the Indiana Supreme Court, Witt attempted to challenge his sentence. The Court dismissed the appeal, finding that the request to file a belated notice of appeal was improvidently granted because Witt failed to demonstrate by a preponderance of the evidence that he had been diligent in requesting permission to file the notice. *Id.* at 1282.

On August 24, 2007, Witt filed a pro se petition for post-conviction relief, which was subsequently amended with the assistance of counsel. On February 12 and May 22, 2009, an evidentiary hearing was conducted. On April 9, 2010, the post-conviction court issued its findings of fact, conclusions of law, and order denying Witt post-conviction relief. This appeal ensued.

**Discussion and Decision**

### Standard of Review

■ The petitioner in a post-conviction proceeding bears the burden of establishing the grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5); *Fisher v. State*, 810 N.E.2d 674, 679 (Ind.2004). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* On review, we will not reverse the judgment of the post-conviction court unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-convic-

tion court. *Id.* A post-conviction court's findings and judgment will be reversed only upon a showing of clear error, that which leaves us with a definite and firm conviction that a mistake has been made. *Id.* In this review, findings of fact are accepted unless they are clearly erroneous and no deference is accorded to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

### I. *Statutory Prohibition Against LWOP*

■ Witt seeks to have his sentence of LWOP vacated and a term of years imposed. He contends that he is entitled to this remedy because his sentence violates Indiana Code Section 35–50–2–9(a), which provides in relevant part: "the state may not proceed against a defendant under this section [Death sentence; life imprisonment without parole] if a court determines at a pretrial hearing under IC 35–36–9 that the defendant is an individual with mental retardation."[5]

■ A person who pleads guilty is not permitted to challenge the propriety of that conviction on direct appeal; however, he is entitled to contest on direct appeal the merits of the trial court's sentencing decision where the trial court has exercised sentencing discretion, that is, where the sentence is not fixed by the plea agreement. *Collins v. State*, 817 N.E.2d 230, 231 (Ind.2004). "[B]ecause a post-conviction relief proceeding is not a substitute for direct appeal but rather a process for raising issues unknown or not available at

---

**5.** Initially, Witt framed his argument to include an allegation that his sentence violated both the United States and Indiana Constitutions. However, he developed no corresponding argument with citation to relevant authority in his appellate brief. At oral argument, counsel for Witt conceded that she had located no authority for the proposition that a

LWOP sentence for a mentally retarded individual constitutes cruel and unusual punishment under either the Eighth Amendment to the United States Constitution or Article Seven, Section Four of the Indiana Constitution. Witt's allegation as to an illegal sentence is grounded in statutory authority.

trial, an issue known and available but not raised on direct appeal may not be raised in post-conviction proceedings." *Id.* at 232.

Despite procedural default and notwithstanding the Indiana Supreme Court's determination that Witt had failed to diligently pursue a belated appeal, Witt insists that he may now challenge his sentence as contrary to statute because his claim was "not available to be raised on direct appeal" and "it would be a miscarriage of justice to fail to consider the claim." Appellant's Reply Brief at 1–2.

He points to *Saylor v. State*, 808 N.E.2d 646, 650–51 (Ind.2004), a case in which the Indiana Supreme Court found it "not appropriate to carry out a death sentence that was the product of a procedure that has since been revised in an important aspect that renders the defendant ineligible for the death penalty." He also directs our attention to *Schiro v. State*, 669 N.E.2d 1357, 1358 (Ind.1996), wherein the Court reversed a death sentence in light of a decision handed down some years after Schiro's conviction, which "requir[ed] an express judicial response to a jury recommendation against death." Witt argues that these decisions suggest that extraordinary post-conviction remedies should be available when there have been significant changes in the "legal landscape" after conviction. Appellant's Reply Brief at 2.[6] Nonetheless, Witt is not subject to a death penalty and does not provide an example of sentence revision from LWOP to a term of years in response to changes in the "legal landscape" or in an effort to avoid "a miscarriage of justice."

■ Moreover, his "miscarriage of justice" argument presupposes that he *is* mentally retarded when this factual assertion has been determined to the contrary. After hearing evidence from co-workers, two court-appointed experts and one defense expert, the trial court in Witt's pretrial hearing found that Witt was not, in fact, mentally retarded. Witt now contends that the trial court should not have commissioned re-testing but should have relied upon his grade school testing and resulting diagnosis of mild mental retardation.[7] (Tr. 425–26.) However, Witt invites reweighing of the evidence, which could not have been done on direct appeal, and which also cannot be done in the context of post-conviction proceedings. Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind.2001). In asserting that he is mentally retarded and subject to a sentence not available for a mentally retarded person, Witt has not presented an issue upon which post-conviction relief can be granted.

## II. *Effectiveness of Counsel*

Witt claims that his attorneys were ineffective because they: (1) failed to uncover

---

**6.** Witt points to one change in the law after his plea. Previously, Indiana Code Section 35–36–9–4(b) required the defendant to "prove by clear and convincing evidence that the defendant is a mentally retarded individual." In *Pruitt v. State*, 834 N.E.2d 90, 103 (Ind.2005), a death penalty case, the Indiana Supreme Court declared that, in light of *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the requirement of proof by clear and convincing evidence was unconstitutional. "In effect, we concluded

that *Atkins* necessitated lowering the burden of proof found in Indiana's existing statutory exemption." *State v. McManus*, 868 N.E.2d 778, 784 (Ind.2007), *cert. denied*, 552 U.S. 1298, 128 S.Ct. 1739, 170 L.Ed.2d 543 (2008).

**7.** He was tested in 1983 and found to have a "full scale" IQ of 76. In 1988, he tested at "full scale" IQ of 74. In 1989, he tested at 50. (Tr. 425–26.)

evidence of the judge's bias and move for a change of venue and (2) failed to adequately present the claim of mental retardation.

To establish a post-conviction claim alleging a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, a defendant must show that counsel's performance was deficient." *Id.* at 687, 104 S.Ct. 2052. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* "Second, a defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial," that is, a trial where the result is reliable. *Id.* To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind.2000).

 Witt claims that the judge who sentenced him was biased, in that he believed Witt to be beyond rehabilitation. Witt points to the judge's sentencing statement in a separate case. On July 10, 1995, Judge Letsinger sentenced Witt for an earlier Attempted Rape conviction, stating:

> This was not an isolated incident and usually I spend some time trying to explain the cause and effect of actions by a defendant in prison sentences and I'm not going to spend too much time with you, Mr. Witt, because you're, I guess, you are what prison was designed for.

(Ex. Vol. pg 302.) Witt claims that his attorneys should have read the prior sentencing transcript and discovered the judge's alleged bias. Had they done so, he argues, they would have been prepared to move for a change of judge in the instant matter.

 We "strongly presume" that counsel provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *McCary v. State*, 761 N.E.2d 389, 392 (Ind.2002). In this instance, Witt has not rebutted that presumption. He has not directed our attention to any legal authority or expert testimony indicating that an attorney is reasonably expected to review the transcripts of prior cases involving his or her client to discern possible bias on the part of the judge presiding in the matter for which the attorney is currently providing representation. Accordingly, Witt has not shown that his attorneys' performance in this regard fell below professional norms.

 Witt also faults his attorneys for not doing more at his pretrial hearing to establish that he is mentally retarded. First, he claims that the attorneys failed to correct a false assumption that an I.Q. score of 70 or below was a prerequisite for a finding of mental retardation. Second, Witt claims that the attorneys should have insisted that the juvenile testing be relied upon to the exclusion of adult testing. Finally, he insists that the attorneys failed to properly present evidence of a "Flynn ef-

fect."[8]

Indiana Code Section 35–36–9–2 provides that an "individual with mental retardation" is "an individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior." There are two prongs, the "intellectual functioning prong" and the "adaptive functioning prong." *Pruitt v. State*, 903 N.E.2d 899, 916–17 (Ind.2009), *reh'g denied.* While the statute does not include an IQ "cutoff," our Indiana Supreme Court has referred to works of the American Association on Mental Retardation and the American Psychiatric Association providing that a person is considered to meet the subaverage intellectual functioning component if the person's full-scale IQ test score is two standard deviations below the mean; i.e., an IQ between 70 and 75 or lower.[9] *See State v. McManus*, 868 N.E.2d 778, 785 (Ind.2007), *cert. denied*, 552 U.S. 1298, 128 S.Ct. 1739, 170 L.Ed.2d 543 (2008).

At the post-conviction hearing, Dr. Caruana testified that, if asked about "cutoffs," he would maintain that Witt "does not quite fall below a cutoff." (P.C.R. Tr. 68.) However, he opined that too much attention had been focused on "numbers"[10] at the pretrial hearing and that the juvenile testing was most appropriate. According to testing in "adaptive years," Witt was diagnosed with "mild mental retardation." (P.C.R. Tr. 74–75.) Nonetheless, the record of pretrial proceedings does not indicate that the trial court or

parties considered an IQ score of 70 or lower to be determinative of mental retardation. Moreover, had Witt's attorneys sought to emphasize the juvenile testing and exclude adult testing, the trial court was not constrained to consider only evidence from formative years. Our Indiana Supreme Court has explained:

> Subsequent tests may be of less significance, but the overall evaluation including behavior and tests after age twenty-two may be relevant. More importantly, IQ tests are only evidence; they are not conclusive on either the subject's IQ or the ultimate question of mental retardation. Rather, the statutory test is "significantly subaverage intellectual functioning." In determining whether an individual is or is not mentally retarded, the trial court may consider IQ scores together with other evidence of mental capacity.

*Pruitt v. State*, 834 N.E.2d 90, 106 (Ind. 2005). The trial court properly considered IQ tests, including adult tests, and other evidence of adaptive functioning.

Finally, there is no evidence that Witt's attorneys should have had knowledge of and argued for application of the "Flynn effect" at the pretrial hearing. The "Flynn effect" is a phenomenon first identified by Professor James Flynn in 1984 and refers to the gradual and incremental rising of IQ test scores as the test ages. Witt contends that it became widely accepted in 1998, and concedes that this was subsequent to his evaluation, hearing, and decision to plead guilty.

8. At the post-conviction hearing, Dr. Caruana testified that an "adjusted" 1978 score of 75 would reduce to 73, a 1983 score of 76 would reduce to 73, and the 1988 score of 74 would reduce to 69. (P.C.R. Tr. 109.)

9. Here, Dr. Ingersoll testified that a range "can be up to 75" but the DSM makes clear "that there has to be some very significant

deficits in adaptive functioning in order for a clinician to diagnose." (Tr. 529.)

10. Nonetheless, Dr. Caruana testified that the DSM still had "approximately 70" as a "cutoff" with "cautions to go as far as 75." (P.C.R. Tr. 105.)

The American Association on Intellectual and Developmental Disabilities' User's Guide: Mental Retardation Definition, Classification and Systems of Supports (10th Ed.) explains as follows:

In his study of IQ tests across populations, Flynn (1984, 1987, 1999) discovered that IQ scores have been increasing from one generation to the next in all 14 nations for which IQ data existed. This increase in IQ scores over time has been dubbed the Flynn Effect.... In cases where a test with aging norms if used, a correction for the age of the norms is warranted. For example, if the Wechsler Adult Intelligence Scale (WAIS–III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS–III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the Full–Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS–III Full–Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years X 0.33 = 2.9). Hence, using the AAMR 2002 System, significant deficits in intellectual functioning of "at least two standard deviations below the mean" (Luckasson et al., 2002), the approximate Full–Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

(App.101–02.) At the post-conviction hearing, Dr. Caruana described the projected effect upon Witt's IQ scores as follows: an "adjusted" 1978 score of 75 would reduce to 73, a 1983 score of 76 would reduce to 73, and the 1988 score of 74 would reduce to 69. (P.C.R. Tr. 109.) However, application of the "Flynn effect" would not necessarily, or even probably, have resulted in a finding of mental retardation. As explained by Dr. Ingersoll, although an IQ range of "up to 75" can be consistent with mental retardation, the DSM makes clear "that there has to be some very significant deficits in adaptive functioning in order for a clinician to diagnose." (Tr. 529.) Here, the evidence of Witt's adaptive functioning did not suggest such "significant deficits," as he was capable of self-care, social relationships, employment, and holding a driver's license.

In sum, counsels' efforts and strategies, although they did not ultimately achieve the result desired by Witt, were not so unreasonable as to constitute ineffective assistance of counsel.

### Conclusion

Witt cannot prevail upon his attempt to present a free-standing claim of sentencing error. Moreover, he did not establish that he was denied the effective assistance of counsel. The post-conviction court properly denied Witt's petition for relief.

Affirmed.

ROBB, J., and BROWN, J., concur.