# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00691-COA

JACQUILLE GRAVES                                                              APPELLANT

v.

STATE OF MISSISSIPPI                                                           APPELLEE

DATE OF JUDGMENT:              05/16/2024
TRIAL JUDGE:                   HON. STANLEY ALEX SOREY
COURT FROM WHICH APPEALED:     SIMPSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: DANIELLE LOVE BURKS
DISTRICT ATTORNEY:             CHRISTOPHER DOUGLAS HENNIS
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 10/14/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     Jacquille Graves was convicted of first-degree murder in the Circuit Court of Simpson County, Mississippi. On appeal, Graves argues that the trial court erred by failing to conduct a competency hearing. We find no error and affirm.

## FACTS

¶2.     On July 22, 2020, Deputy Richard Dean of the Simpson County Sheriff's Department was dispatched to Butler Road Cemetery after a caller reported finding a large pool of blood there. When Deputy Dean arrived, he observed two large pools of blood and one small pool. He also observed a white Ford F-150 pickup truck that the caller had mentioned, and it was

parked roughly one hundred feet away from the blood pools. Upon inspection, Deputy Dean noted blood on the driver's side door, on the rear fender, and in the bed of the truck.

¶3. Dean secured the scene to make sure it was undisturbed until other investigators arrived. Investigators placed crime scene tape around the area, took photographs, collected evidence from the scene, and placed evidence markers. Investigators collected a blood-stained shovel and a knife at the scene. Inside the truck, investigators found a wallet containing cards and some cash but no "communication device." Chad Shows, a conservation officer with the Mississippi Department of Wildlife, Fisheries, and Parks was also called to rule out the possibility that the blood may have come from an animal.

¶4. Other deputies ran the tag number on the Ford F-150 and determined that the vehicle was registered to a Carl Gray. The investigation revealed that Carl Gray was deceased and that his son, Carlton Gray, was possibly driving the truck. With that information, the investigators began looking through the area trying to locate Carlton.[1]

¶5. Shows testified that after they had searched the cemetery grounds, he left, and he noticed not far from the cemetery that a vehicle had left the roadway where he was traveling and had entered a wooded area. Shows then pulled into the area where he saw the tire marks. He exited his vehicle and came upon a body about seventy yards from the road. Shows contacted the Sheriff and advised him of what he had discovered. According to Shows, the Sheriff's Department responded immediately and closed off the scene. The Sheriff's Department was able to identify the body as that of Carlton Gray.

---

[1] At some point the investigators had learned that Carlton had a cell phone, but it was not recovered at the scene.

¶6. Dr. Mark LeVaughn testified as to the injuries to Carlton's body, mainly finding a combination of sharp-force injuries and blunt-type injuries. There were twenty-five sharp force injuries, one of which severed the left carotid artery. In Dr. LeVaughn's opinion, the cause of death was multiple stab wounds, and the manner of death was homicide.

¶7. The Sheriff's Department had no leads on who killed Carlton. After learning from his family that Carlton had several dating apps, a search warrant was issued for the content. Officers were unable to determine whether Carlton had talked to or sent messages to anyone on the night of his death. Further, the DNA evidence collected at the scene did not lead to a suspect.

¶8. On March 11, 2021, the Sheriff's Department received an anonymous call that made Graves a person of interest. The investigators learned that Graves lived on St. John Road, which was located almost directly across from the cemetery on Butler Road. The same day they received the anonymous call, investigators spoke with Graves' mother. They informed Graves' mother that there had been a murder across the street at the cemetery and that Graves' name had come up during their investigation.

¶9. On March 16, Investigator Herrin conducted an interview with Graves. Graves was read his *Miranda* rights[2] and signed a form indicating that he understood his rights and wished to waive those rights and speak with Herrin. Herrin's interview with Graves was recorded, and it was admitted into evidence at trial and played for the jury. After the jury reviewed the recorded interview, Herrin, who had watched the video again the day before

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

trial, testified as to its contents:

> Q.       Investigator Herrin, of course, you were there live, and you've watched
> it again. What was learned from this interview?
>
> A.       Jacquille Graves communicated with Carlton Gray over Snapchat and
> met up in the cemetery on Butler Road or Butler Drive there off of St.
> John. Jacquille Graves killed Carlton Gray with a knife and a shovel,
> moved his body, loaded him up in the pickup truck and moved his body
> up the, up St. John Road about a quarter of a mile, dumped his body out
> there and returned the truck back to the cemetery.
>
> Q.       And based on your interview with him, did he come to the cemetery
> with the knife and the shovel with him?
>
> A.       According to his interview and his statements, yes.

Herrin's testimony concluded, and the State rested its case. Defense counsel then moved for a directed verdict, which was denied by the circuit court.

¶10.    Graves chose to testify, against the advice of counsel, and was the sole witness for the defense. Graves first told the jury that he did not remember anything about July 22, 2020, but then said he had been at home. He further testified that he had never met Carlton and had no idea who he was. On cross-examination, Graves denied everything that he said in the video. He argued that the video was not physical evidence and could not be used in court. After Graves mentioned a murder charge against him in Lamar County, defense counsel moved for a mistrial, which the circuit court denied.[3] After both sides announced they would rest, defense counsel renewed his motion for a directed verdict, which was again denied. The jury was instructed, and counsel delivered closing arguments. Graves made his own closing argument, basically repeating his earlier testimony that he did not know Carlton and that the

---

[3] Graves volunteered the information regarding the murder charge in Lamar County.

4

video was not evidence and could have been manipulated.

## ANALYSIS

¶11.    Graves' sole issue on appeal is whether the circuit court erred in failing to hold a competency hearing. On March 2, 2022, Graves filed a motion for a mental evaluation and treatment. On March 3, 2022, the circuit court entered an agreed order providing that Graves be given a mental evaluation for the purpose of evaluating the following:

> (a) whether or not he has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in the preparation of his defense, and has a rational as well as factual understanding of the nature and object of the legal proceedings against him; (b) to describe his mental state at the time of the alleged offense(s) with respect to his ability to know the nature and quality of his alleged acts and to know the difference between right and wrong in relation to his alleged acts at that time; (*M'Naughten* Analysis) (c) any mitigating circumstances; especially whether the offense with which the defendant is charged was committed while he was under the influence of extreme mental or emotional disturbance; and whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired[;] and (d) his capacity to understand and to knowingly, intelligently, and voluntarily waive or assert his constitutional rights.

That mental evaluation was performed on December 7, 2022, by R. M. Storer, Ph.D., a clinical and forensic psychologist, and his report was issued on December 13, 2022.

¶12.    Dr. Storey considered twenty-seven sources of information, including telephone interviews he conducted with members of Graves' family, reports generated by the Simpson County Sheriff's Department regarding the crime, jail records, medical records, Herrin's affidavit, and his approximately two-hour and fifty-three-minute "clinical interview and psychological testing of Graves." In his report, Dr. Storey discussed Graves' family, development and social history, medical history, substance abuse history, mental health

5

history, employment history, legal history, course of current incarceration, current mental status, assessment of competence-related abilities, and an assessment of Graves' mental state at the time of the alleged offense. After completing his evaluation, Dr. Storey found Graves competent to stand trial. His report was filed in the court file, and the fact that the report showed Graves was competent was discussed during a pretrial hearing on other matters. After acknowledging the findings in the report, neither party requested a competency hearing.

¶13.   In *Mount v. State*, 412 So. 3d 538, 551-52 (¶39) (Miss. Ct. App. 2025), we explained

> There is a presumption that a criminal defendant is competent, and "[t]he burden of proof rests on the defendant to prove that he is mentally incompetent to stand trial." *Evans v. State*, 226 So. 3d 1, 14 (¶22) (Miss. 2017). A defendant is competent to stand trial if he has "the ability to perceive and understand the nature of the proceedings, to communicate rationally with [his] attorney about the case, to recall relevant facts, and to testify in [his] own defense, if appropriate." MRCrP 12.1. "[A] mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial." *Id*. In addition, a competency determination "is a legal inquiry, not a medical inquiry." *McManus v. Neal*, 779 F.3d 634, 658 (7th Cir. 2015). "This Court will reverse a trial court's competency determination only if it is manifestly against the overwhelming weight of the evidence." *Sandoval v. State*, 315 So. 3d 469, 474 (¶17) (Miss. 2021) (quotation marks omitted); *accord Garcia v. State*, 300 So. 3d 945, 965 (¶62) (Miss. 2020).

¶14.   The comment to Mississippi Rule of Criminal Procedure 12.5 provides:

> Under Rule 12.5(a), upon the court's own motion or the motion of any party, a competency hearing shall be conducted. **But in the absence of such motion, a hearing is permissible, but not mandatory.**

(Emphasis added).

¶15.   In *Smith v. State*, 391 So. 3d 1212 (Miss. Ct. App. 2024), we explained further:

> At one time Mississippi caselaw required a hearing once an order for an evaluation had been entered; however, the supreme court rejected that requirement in *Pitchford v. State*, 240 So. 3d 1061, 1068-69 (¶¶37-42) (Miss.

6

2017):

> Since this Court's decision in *Sanders v. State*, 9 So. 3d 1132, 1142 (Miss. 2009), [Uniform Rule of Circuit and County Court Practice] 9.06 has been construed to mean that, in any instance in which the trial court orders a competency evaluation of the defendant, this establishes conclusively (for appellate-review purposes) that the trial court had reasonable ground(s) to believe the defendant might be incompetent to stand trial, thus triggering Rule 9.06's competency-hearing mandate. *See Smith v. State*, 149 So. 3d 1027 (Miss. 2014) (construing *Sanders*'s and *Coleman*'s interpretation and application of Rule 9.06 to mean that a trial court's grant of an order for a mental competency evaluation is "conclusive of its having found reasonable ground to believe [the defendant] was entitled to a mental examination and a competency hearing"); *see also Hollie v. State*, 174 So. 3d 824, 830-32 (Miss. 2015) (in which a majority of this Court held, based on *Sanders*, *Coleman* [*v. State*, 127 So. 3d 161 (Miss. 2013)], and *Smith*, that a mental evaluation ordered by the trial court constitutes "a per se showing that the trial court had reasonable grounds to believe the defendant was incompetent to stand trial").

> We find this to be a hypertechnical interpretation and application of Rule 9.06 that improperly expands the scope and purpose of the rule and conflicts with Mississippi precedent. Therefore, we reject it.[4]

> . . . .

*Id.* at 1216 (¶12).

¶16.   Based upon *Smith*, *Pitchford*, and Mississippi Rule of Criminal Procedure 12.5, a competency hearing was not mandatory. Graves did not request a competency hearing and never presented any evidence to overcome the presumption of his mental competency. Based on the record, we cannot find that the circuit court erred by failing to conduct a competency

---

[4] Rule 9.06 has been supplanted by the Mississippi Rules of Criminal Procedure. *See Malone v. State*, 375 So. 3d 713, 720 (¶18) (Miss. Ct. App. 2023).

hearing under the facts of this case.

¶17.     **AFFIRMED.**

    **BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**